The next case is Appeal No. 22-2166, Lanier v. Air Force. Counsel for appellant is Ms. Smith. You've reserved five minutes of rebuttal time, is that accurate? Yes, Your Honor. You may proceed. Good morning. May it please the court, I'm Bonnie Michelle Smith and I'm counselor for Chris Lanier. Chris Lanier is in the third row in a brown shirt and he has gotten up numerous times to go to the restroom because he is type 1 diabetic, which is at issue in this case. Type 1 diabetic? Yes. All right. Type 2 is the... You're right. You read the report better than me, Your Honor. It's type 2. Yeah. You're right. He's type 2 diabetic. During COVID on August 26, 2020, Chris Lanier was called in to test for a urine sample, which is routine at Robbins Air Force Base, and he tested positive for methamphetamines. The Air Force, the ALGA, and the MSPB got this one wrong. And they got this one wrong because we're arguing about strict liability, because it's strict liability. If you test for drugs, it's either yes or no, right? It's either yes or no. He tested positive, and so that's it. When Mr. Lanier signed his notice that he would be subject to drug testing, that was for a WG260408. At the time he was tested, he was a WG260410. He never signed a new form stating that he would be drug tested for the WG260410. When he was drug tested, the test did not follow proper protocol. Can we talk about the diabetes where you started? The timing with which that came up, if I understand correctly, was there was no allusion to it until maybe your own client's testimony in front of the ALJ, and then the medical records to support that predate the close of the record, but were not produced until you got all the way up to the board. Do I have that right? Yes, you do have that right, Your Honor. If that's right, how can we say the board was wrong to say that that evidence was untimely? Many times when you're diabetic, you don't even know you're diabetic. It's a silent killer in this country. CDC in 2021, which is the time period when he got fired, estimated that 38.4 million people in the United States are diabetic and they don't even know it. Right, but he testified that he found out because of blood tests, blood work that was done on, I think, May 25th, 2021, he found out that he was diabetic. We have the evidence in the record that shows what the blood tests, the A1C and so forth showed. It wasn't until later that year, in October, that the hearing was held before the hearing exam by the AJ, and at that point, those records were not produced. He testified that he was diabetic, but no records were produced, and the AJ said, in the absence of records, I'm not going to find that that was true. But why? The question comes up, why weren't the records produced at the hearing? You had six months from the time that they were generated. At that particular time, Mr. Lanier was represented by a union, and so he was represented by the They didn't produce those, but that doesn't mean then he couldn't reopen the record to add those records. He didn't reopen the record. He took a petition for review to the full board, and the full board will not consider evidence that was not presented before the AJ, and they said, in this case, they wouldn't. That's just part of their procedure. You can't add evidence at the PFR stage. You're right, Your Honor, which is why we go back that the agency didn't follow the rules on the test. We may not, we may have to concede that we can't, we can't, we all know he was diabetic. He was diabetic for whatever reason. It's not in the record. At least as of May of 2021, not necessarily in previous August when he was tested. Correct. Yeah, you're correct, Your Honor. So if you can't bring the records in legitimately because you can't reopen the record, then you harp back then to get to the right result that the agency failed to follow the rules. It's strict liability. They failed to follow the rules. They say, well, it wasn't harmful error because, you know, it doesn't matter if there's an initial, you're still going to test positive. No, the rules are the rules. That's why he got fired, because the rules are the rules. You argue that the drug testing sample was over diluted by the lab, is that also an argument that you're making? Yes, Your Honor. What's the evidence that you have to support that the lab itself made that over dilution? Can you point us to something in the record? I believe that was back with the testimony of Dr. Figueroa, the medical examiner from Well, in A49, Supplemental Appendix 49, at the bottom of the page, there's a reference by, I think this was a memorandum prepared by Colonel Gross. She says that, she refers to the over dilution, but said not by the lab that it was over diluted, but it was over diluted in the sample, right? Right. Right, which suggests, since the sample was provided, not by the lab, but by your client, that suggests the over dilution occurred before the sample found its way to the lab. And we don't have any evidence, so far as I can see, that the over dilution, regardless of who it was caused by, would have produced a false positive. It seems more likely that dilution would produce a false negative, isn't that right? Correct. So, then you go back, still on the harmful error that numerous places were not signed on, you have to have a chain of custody on that specimen. You've got to check off exactly who got it when, and the agency says, well, it doesn't matter that you didn't check it off, because that didn't really produce any error in the report. I think they also say, it's undisputed, but correct me if I'm wrong, that that was your client's sample, and that it tested positive. I know you weren't counsel, but counsel agreed to those two facts, did they not? Yes. So, then how can, even if the chain of custody was messed up, how can that even matter if Mr. Lanier's counsel agreed, at the end of the day, that's his sample, and it tested positive? The sample can be corroborated, that that can be your sample, but if the procedure is not followed, then it should be canceled and dismissed as part of the evidence. His diabetes report is canceled and not part of the record, because it didn't come in in a timely manner. So, it's not important, because it didn't come in in a timely manner. The agency didn't sign off an initial at every point of where they were supposed to, so then the sample isn't valid. The sample, you're right, the sample is there, you can agree that that's his sample. But if the agency doesn't follow its own rules, then that in and of itself, then should cancel that. That's our argument. Further, under the Douglas factors, the discipline was disproportionate. I know there was argument then on both sides about whether in the Master Labor Agreement says that a union employee, like Mr. Lanier, could be referred to drug counseling or some kind of drug rehabilitation, and the agency said, well, that's not for sure, they may refer them. Further, then, if you take that same argument, it also says that if you test positive for any kinds of drugs, you may be fired, it doesn't say you shall be fired, so then, how do you juxtapose both of those? I understand why the agency at Robbins Air Force Base and the ALJ and the MSPB doesn't want to open this wide open. We drug test every day, and it's easy for the, we know how many people are diabetic. I understand that. But the result here is wrong. It's wrong for him to have lost his job when we all know he was diabetic, and most likely that's what happened. So what we can do is we go back that it was harmful procedural error. Counsel, you don't need to raise your voice so high, we're pretty, we're in a nice intimate courtroom so you can just speak to us. We're here with you. I'm naturally loud, sorry. I don't mean to be loud. I'm just very passionate about that, Mr. Lanier. I feel like Mr. Lanier has been wronged by a system that's busy keeping the system that works and I understand that we can't have people working who test positive for methamphetamines, but there's a legitimate reason of what happened here. And they say they called him, they didn't call him. We know for sure they did not initial reports. That we know for sure. Were there any medical tests showing diabetes that predated the positive tests that I believe occurred in August of 2020? I'm not, I do not, I don't think he knew then because most of his records were in place. Testified that he didn't know. Yes, I don't think he knew then. Which is consistent with the majority of Americans because it's a silent epidemic. You have no idea that you're diabetic. Can you help me on this? I don't think there's anything on the record in this, but please tell me if I've missed something. Your client took a subsequent drug test and tested negative, correct? Yes, your honor. How could he test negative if on your reasoning having diabetes is going to lead to a positive test? Just because you're diabetic doesn't mean you're going to have a positive test unless you ingest some type of pseudofed, you have, some people use it. So you need the cold medicine plus the diabetes. Yes. And is there, you're probably right, is there anything on the record that we could point to to say that's the combination? That was also then we attempted to insert that into the record on those exhibits, but those were disallowed because those were after the record closed about how they can metabolize after. But I thought the evidence was that the GCMS exam was not sensitive to pseudofed. That is to say that having pseudofed in your system would not produce a false positive. The agency produces no expert testimony that said that. I mean they said that, but I mean there wasn't an expert, I mean other than Dr. Figaro, who's the medical examiner, who is, I mean so is he. He's a doctor who does this type of work all the time, right? Yes. Yeah, and that was his position. Yes, and his position also was that if someone were diabetic and that it could cancel out a test. I know we're in a conundrum, and I appreciate you all taking the time to hear Mr. Lanier. It's tough, but he needs his job back. Do you have any further questions or I can yield my time? You can yield it or you can reserve it for a follow-up. Thank you. Thank you. I'll reserve. Okay. Mr. Moore. Yes, ma'am. You may proceed. May it please the Court, this Court should affirm the decision of the Merit System Protection Board, this Court should affirm the Merit System Protection Board decision because it was supported by substantial evidence. First, based on both the record evidence and the stipulation of Mr. Lanier, the Administrative Judge found that Mr. Lanier's position was a testing-designated position, that he provided a specimen that tested positive for an illicit drug, methamphetamines. That decision is supported by substantial evidence, and Mr. Lanier has not challenged it on appeal. Second, the Administrative Judge finding that there was no harmful procedural error was also supported by substantial evidence. The Administrative Judge found relying on the unrebutted testimony of Ms. Jean Chambers who's the responsible person for civilian drug testing at Fort Meade, that no overcount of the medications such as Sudafed could result in a positive test. She found no fatal flaws or anomalies regarding the attest of appellant's urine. Furthermore, regarding the diabetes issue, again, I think this Court has a question of opposing counsel on, that was not raised at the Administrative Judge level. It was raised. Well, it was raised. It was raised. That's right, Your Honor. But you say the evidence that was produced to the full board was not before the AJ. That's correct, Your Honor. Except for his testimony. His testimony. And he did testify that, A, he had diabetes, and B, that he discovered that in May of 2021. I don't know if he testified that he discovered that in May of 2021 at the... He had a blood work done on that day. That's correct. And then, presumably promptly thereafter, discovered, but in any event, did discover that he had diabetes well before the time of the hearing, because he testified that he had learned it from the blood test. Yes, Your Honor. I think that's correct. I mean, the whole diabetes thing is concerning, because the AJ said, well, all you've done is testify, and I don't find your testimony to be credible. Sure enough, it turns out when we look at the records, it was credible. In fact, it was true. So your position is, well, he should have introduced the records at that time. Then there's Dr. Fiero, who says that, at the hearing, says that diabetes can produce a false positive. Yes, Your Honor. In fact, that's what he said. I think you'll agree that's the gist of his testimony. That is my understanding, Your Honor, yes. So your submission is that, well, failing to produce the records that confirmed the accuracy of his testimony is the basis on which we should affirm. Not precisely, Your Honor. You know. Okay. How is it different from what I'm saying? So two points, Your Honor. First, Mr. Lanier was represented by counsel at the agency level, the administrative judge level, the board level, and now here. Right. And throughout that entire time, he has failed to produce any evidence showing that he had diabetes at the time of the drug test in August of 2020. And so this court could affirm, based on the fact that ... Diabetes, by and large, doesn't just leap up and grab you. We're talking about a six-month period between August and, well, seven, eight-month period between August of 2020 and May of 2021. So if he tested, his A1C was pretty high when he tested. So the idea that he didn't have any diabetes condition above 6.5 is a little hard to credit in those eight months. He went from 6.5 to a much higher level. Right? Well, Your Honor, I guess the record evidence doesn't elucidate how diabetes progresses, indeed, what type of diabetes Mr. Lanier could have had. And so I'm not sure I can comment specifically on how diabetes progresses, how long it takes for diabetes to demonstrate itself, or, in fact, whether or not having full-blown diabetes at one point versus not full-blown diabetes at another point could affect the false positive on a drug test. Well, that we do know that Dr. Fiero said that it could produce, diabetes can produce a false positive, right? Even with the particular test that was used in this case. Yes, Your Honor, I believe that is the testament of Dr. Fiero. Whether or not, as Your Honor, I think is referring to, if someone had diabetes at one point, prior to that point, obviously, they did not have diabetes, assuming this is, I believe, type 2 diabetes. Right. At some point, a person with type 2 diabetes does not have diabetes. Yes, Your Honor. I believe that's correct. But the record doesn't reflect when exactly Mr. Lanier had diabetes, or, indeed, the record doesn't reflect how long it takes for type 2 diabetes to, I guess, fully come on in an individual such that it could affect the testing and produce a false positive on a drug test. I'll also note, again, as this Court, as noted in questioning with opposing counsel, is that Mr. Lanier came forward negative. I mean, I think that lends credence to the Administrative Judge's decision that, you know, their, excuse me, that lends credence to the Administrative Judge's conclusion that substantial evidence supported the fact that Mr. Lanier did not come forward as sort of mitigating evidence that he did, indeed, have diabetes, and it could support this Court's conclusion that Mr. Lanier, in fact, did not have diabetes at that point. I'll also note that, you know, he did present this evidence to the Board. I'm not sure about the latter inference. That would be something in the stretch, it seems to me. You may be correct on that, Your Honor, yes. I will note that the full Board did review this, and under the Board's precedent, which is Avancino v. U.S. Postal Service, which it cited in its decision, and I think that's footnote two, which is Supplemental Appendix 7, that, you know, Mr. Lanier has not provided any reasoning, did not provide any reasoning to the Board, and hasn't provided any reasoning to this Court why he, you know, due diligence, why he did not provide the evidence to the Administrative Judge at the time of the hearing. Indeed, this evidence was available to Mr. Lanier before his notice, the final decision to remove him from the Air Force. Didn't present it to the Air Force then, didn't present it to the Administrative Judge, the Administrative Judge hearing. And... Well, help me with this, and this is speculation, but my reading of the record suggests that the whole diabetes issue didn't come up until Dr. Fierro said, in the course of his testimony, kind of offhand, he said, various diseases can cause a lower pH, and therefore, potentially a false positive, such as diabetes, and he moved on. And presumably, his lawyer at that point, or perhaps Mr. Lanier, says, I have diabetes, and that is the first time the diabetes issue made its way into the record. So, it seems to me it's perhaps understandable that the whole diabetes issue was not something that counsel had seized on well in advance of the hearing. Doesn't that seem fair, given the sequence of events? That is certainly one interpretation, Your Honor. Certainly another interpretation is that Mr. Lanier heard about the diabetes, said, oh, I have diabetes, and, you know, came forth and said, that could be one reason, among many others that Mr. Lanier has presented here, why he believes that the test was a false positive. Another plausible result is that Mr. Lanier indeed did ingest methamphetamines, and he did indeed come in for a test, and that test came back positive for methamphetamines. And I believe that decision is what the administrative judge came to, and that decision certainly is plausible and supported by substantial evidence, I believe, based on the record that I presented today. I think Ms. Smith was suggesting that maybe Mr. Lanier had not signed a document indicating he understood he was subject to drug testing at the appropriate time. Do you have a response to that? I don't believe that was raised in her brief to this court or below, Your Honor. My understanding is that, let me pull up the record site here, is that Mr. Lanier did, you know, sign a notice that he was in a testing-designated position, and that would be at Supplemental Appendix 84. Is that signed in connection with this particular position as opposed to a different position? So this is signed in regards to the WG2604, Grade 8. I believe she stated that Mr. Lanier was in a WG2604, Grade 10, is, I believe, what's the testimony. I'm not sure whether or not, and the record doesn't reflect, whether the change in grade would mean that he would not be in a testing-designated position. I believe that, while the grade may change, the position title is the same, and I think his position would be the same. There's no dispute that he was an airplane mechanic, and I think that, you know, whether there was some, you know, a change in grade, i.e. he was being paid more, I think that if anything, that would mean that he would continue to be in a testing-designated position. And further, you'd say he didn't raise a dispute about whether he was subject to drug testing. No, Your Honor, he did not raise that. Did he, in fact, do you know, stipulate that he was subject to drug testing? Your Honor, I believe the stipulation, which is on Supplemental Appendix 15 here, is that he signed and acknowledged the notice of drug testing as a condition of employment for a WG260408. That's the Supplemental Appendix 83 that I'm referring to here. Thank you. And finally, Your Honor, just referring to the, I believe the issue of the nexus and penalty was raised, the administrative judge found, based on substantial evidence, that the penalty of removal did not exceed the bounds of reasonableness, a decision supported by substantial evidence. As detailed in the agency's notice of removal, the proposed penalty of removal was consistent with those imposed on other employees with the 56-AMXS, which is the base that he was on for the similar or offenses. And the penalty is consistent with the Air Force table of penalties. The administrative judge also noted, which is on Supplemental Appendix 2425, cited other cases in which individuals in the Air Force had been removed for single-duty, single-use off-duty drug use. Therefore, the administrative judge thus committed no error in concluding that the removal did not exceed the bounds of reasonableness. I guess the Court has any further questions. Thank you. Thank you, Your Honor. Any rebuttal? Yes, Your Honor. And I do apologize for being so loud before, my eardrums burst when I was a little girl. It's an occupational hazard that most times is very helpful. We're just not one way that so close together. So I do apologize. That was not my intent. I think it is peculiar that the agency, they can justify when the strict liability, they think the strict liability that he tested positive, so he has to be a meth head. There's no other reason. He tested positive, and that's it. Yet, when he signed the WG, and that was in the initial decision of the American System Protection Board, the pre-hearing agreements, they agreed to that the appellant held the position of an electronic mechanic, WG 260410, so they have stipulated and agreed that. And the form that he signed was for WG 26048. How is that not harmful error? How is that not strict liability? We're holding Mr. Lanier to strict liability. Well, you, the record was closed. You didn't put that in, so that's it. Have you anywhere disputed that he was subject to drug testing for his position at 310? Yes. The original hearing with the petition for a review, that was briefly brought up. Yes. Do you have a citation? We cited on the record, due to Mr. Lanier's... Is that in your supplemental petition for review, or in Mr. Williams' initial petition? I think we cited, we got permission from the court, and the court ordered that we could rest on the record, so then it's part of the original record, due to Mr. Lanier's finances. So it's in the supplemental appendix at your supplement? Yes. Yes. And that was in what Marion L. Williams did in his initial, he was the union president who was also Mr. Lanier's representative in that petition for review, that he raised that issue. He was a representative, or was he counsel? No, he's just a lawyer. No, Mr. Williams, he's been the union president for several years over at AFG in Warner Robins. In our brief, we also raised that the chain of custody wasn't filed, that there were numerous initials that were not made, we had made that. So, you're over your rebuttal time, any last thought, and we can wrap it up. I know this is a hard one, and I appreciate your time, and I hope none of you are Florida State fans, but I hope if you dislike the football committee that just had to figure out the final four, and they had to justify who was going to be on the fourth position, and they had to come up with a reason, I think we've provided enough of a reason to allow the case to either be remanded back to the board, or to be completely overturned, because the procedure was not followed, and therefore, since the procedure wasn't followed, then the test should be invalid. Thank you so much, we appreciate it. This case is taken under submission.